UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

_____

PETRA YOUNGQUIST,

     Plaintiff,

v.

THE BOARD OF COUNTY
COMMISSIONERS FOR CURRY
COUNTY, NEW MEXICO, a political
sub-division existing under the laws of the
State of New Mexico, LANCE PYLE,
individually and in his official capacity as
Manager of Curry County Board of
County Commissioners, TORI
SANDOVAL, individually and in her
official capacity as Administrator of the
Curry County Detention Center, ROBERT
SANDOVAL, individually and in his
official capacity as Curry County
Commissioner, BEN McDANIEL,
individually and in his official capacity as
Curry County Commissioner, FRANK
BLACKBURN, individually and in his
official capacity as Curry County
Commissioner, WENDELL BOSTICK,
individually and in his official capacity as
Curry County Commissioner, TIM L.
ASHLEY, individually and in his official
capacity as Curry County Commissioner,
BRITTANY HARRISON, individually
and in her official capacity as Curry
County Correctional Officer, NICOLE
STUART, individually and in her official
capacity as Curry County Correctional
Officer,

     Defendants.

No. 2:15-cv-00077-BRB-SMV

_____

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

After Plaintiff Petra Youngquist was arrested for jaywalking and brought to the Curry County Detention Center, two female officers—Defendants Brittany Harrison[1] and Nicole Stuart—attempted to get Youngquist to remove her clothes so they could perform a strip search of her person.  When Youngquist refused to comply, Harrison shot Youngquist with a Taser.  Youngquist then complied with the search.  Defendants move for summary judgment on the basis of qualified immunity and other grounds on the remaining claims, which include a 42 U.S.C. § 1983 claim in Count I against Harrison and Stuart and state-law tort claims in Count IV against unspecified Defendants and the Board of County Commissioners.  For the reasons stated below, the Court will grant Defendants' motion on the basis of qualified immunity on Count I but deny the motion without prejudice as to Count IV.  Because the only remaining claims after the Court dismisses Count I are state-law tort claims, the Court declines to continue to exercise supplemental jurisdiction and will remand those claims to state court.

**I.**

The following facts are either undisputed or taken in the light most favorable to Youngquist.  Around 11:30 p.m. on July 13, 2013, Youngquist walked across a street in Clovis, New Mexico, without using a crosswalk and causing at least one vehicle to

_____

[1] Harrison has changed her name to Chavez, but the Court will continue to refer to her as Harrison.

swerve to avoid hitting her.  Officer Albert Sena from the Clovis Police Department stopped her and told her he was issuing her a citation for jaywalking.  After she failed to comply with Sena's orders to stand in front of his police vehicle, to not walk away, and to face away from him, Sena told Youngquist she was under arrest.  Youngquist protested that he could not arrest her for jaywalking and that she did not understand why she was being arrested.  After some difficulty, backup officers placed Youngquist in handcuffs, and a supervisor convinced Youngquist to get in a police car to go to the Curry County Detention Center.  On the way, Youngquist asked where the Texas state troopers were that she had allegedly seen on the scene and also asked if Sena was taking her to Mexico to kill her.  Sena believed that Youngquist was high on methamphetamine and hallucinating.

Once they arrived at the Detention Center, Youngquist did not resist officers leading her inside.  Sena advised Detention Officer Sergeant Weston Peasnall about what had occurred during the arrest.  He also told Peasnall that he believed Youngquist was high on methamphetamine and was "holding"—that is, holding narcotics on her person or in her orifices.  Sena and possibly other Clovis officers were "very insistent" that the Detention Center's officers conduct a strip search.  Sergeant Rene Garcia authorized a strip search.  Peasnall called in Harrison and Stuart, the only two female officers on duty in the Detention Center that night.  Stuart was relatively new to her position and went to accompany and observe Harrison, as the Detention Center's policy required two officers to be present during strip searches.  Only Harrison was trained on conducting strip searches.  When officers attempted to escort Youngquist to the restroom for the search,

3

she initially refused, but complied when Stuart and Peasnall pulled her up from her chair.

Once in the bathroom, Harrison told Youngquist several times that she needed to remove her clothes. Youngquist refused. She maintained that the officers were not allowed to do a strip search because she did not have current or prior drug charges. She also protested that the door to the restroom was still open. She asked to change behind a wall, but Harrison would not allow it. Harrison attempted to grab Youngquist's shirt, and Youngquist pulled away. Although Defendants had at some point taken off Youngquist's handcuffs, they decided to re-cuff Youngquist and bring her out of the restroom. Sergeant Peasnall then instructed Harrison and Stuart to "change her out," meaning that Youngquist should change out of her street clothes and into the jail uniform, but would not need to remove her undergarments. Harrison and Stuart interpreted his order to mean that they should continue the strip search. Peasnall admitted after the fact that he should have elaborated on his instruction to ensure Harrison and Stuart did not get "tunnel vision" with the original strip search order. Harrison and Stuart returned to the restroom and attempted to get Youngquist to remove her clothes. At some point, Youngquist's shirt and bra were removed. Youngquist was no longer handcuffed, but Stuart was holding Youngquist's arms behind her back. Harrison and Stuart gave multiple commands for Youngquist to remove her shorts, but Youngquist refused. Harrison attempted to remove Youngquist's shorts, but Youngquist pulled away, swinging her arms and nearly hitting Harrison, although not in a threatening manner.[2]

---

[2] Youngquist attempts to dispute that she swung her arms and almost hit Harrison by pointing to the Taser video and Peasnall's testimony regarding that video, but this

During this encounter, Peasnall was standing outside the bathroom door and repeatedly asked, "Are you guys okay?"  Either Harrison or Stuart said yes.  Peasnall could hear Harrison yelling, "Stop moving," and "Don't do that."  He asked Harrison if she needed a Taser, and she initially said no.  Harrison asked Youngquist several more times if she was going to comply, and Youngquist continued to refuse.  At that point, about eight minutes after going into the restroom with Youngquist, Harrison asked Peasnall for the Taser.  Harrison had been trained on an X-26 model Taser, but Peasnall handed her an X-2 model Taser.  Youngquist was facing the wall but saw the Taser in the room.  Harrison asked Youngquist several more times if she was going to remove her shorts, and Youngquist said no.  Harrison turned off the safety to the Taser, which activated the Taser's video recording.  While Stuart was holding Youngquist's arms and while Youngquist was facing the wall, Harrison asked again if Youngquist was going to take her pants off, Youngquist again said no, and Harrison shot the Taser at Youngquist's back left shoulder blade.  Youngquist then demanded that Harrison shut the door and give her a shirt.  Harrison asked again if she would take her pants off.  Youngquist again said no and demanded her shirt.  Harrison said something else, Youngquist again demanded her shirt, and Harrison shot her a second time with the Taser.  Youngquist then complied with the orders to remove her shorts and then her underwear.  Harrison handed the Taser

_____

incident occurred before the Taser began recording.  Although Youngquist cannot dispute this fact, there is no evidence that Youngquist was attempting to hit Harrison.  Rather, taking the evidence in the light most favorable to Youngquist, the evidence suggests that Youngquist may have unintentionally swung her arms near Harrison and was actually more concerned with covering herself with her arms than threatening Harrison or Stuart.

to Stuart, who had not been trained on any Taser.  Stuart then pointed the Taser at Youngquist.[3]  When Youngquist was completely undressed, Harrison lifted up Youngquist's breasts, had Youngquist squat down and cough, and had Youngquist lean forward while she spread Youngquist's buttocks.  Although policy is to not touch detainees during a strip search, Harrison decided to touch Youngquist in an attempt to expedite the search.  Harrison did not find any contraband.  Youngquist then put on the jail uniform and was checked by medical before going to the female annex portion of the jail.[4]

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine when "the evidence is such that a reasonable

---

[3] Defendants deny that Stuart pointed the Taser at Youngquist, but the Taser video shows a clear image of Youngquist after Harrison handed Stuart the Taser, indicating that Stuart pointed it at Youngquist.

[4] Youngquist's Counsel made the Court's task in sorting out the facts unnecessarily difficult.  Rule 56 requires that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1).  Counsel rarely admitted Defendants' asserted facts even though his responses came nowhere close to actually disputing the facts.  For example, Defendants asserted that, "Once Plaintiff was dressed out, she was seen and cleared by medical staff at the Detention Center."  Motion ¶ 51.  In response, Plaintiff's counsel wrote: "Ms. Youngquist's dignity was 'ripped away from [her].'"  Response ¶ 43(a) (alteration in original).  Counsel did not present evidence here or elsewhere to dispute that Youngquist put on the prison uniform, that medical staff examined her, or that the medical staff cleared her.  As such, he should have admitted this fact and put the evidence that this ordeal negatively impacted Youngquist in his list of additional facts.  Lawyers who practice in federal court are held to a high standard, and Counsel's brief regularly failed to meet this standard.  The Court expects better from Counsel in the future.

jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

Once a defendant asserts qualified immunity, the plaintiff bears the burden of persuasion to show (1) that a reasonable jury could find facts that the defendant violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the defendant's unlawful conduct. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). The Court has discretion to decide these prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231.

### III.

The claims remaining after the Court granted Defendants' Partial Motion to Dismiss, *see* Order Granting Defendants' Partial Motion to Dismiss (Doc. 24), include a § 1983 claim in Count I against Harrison and Stuart in their individual capacities and state-law tort claims in Count IV against unspecified Defendants and the Board of County Commissioners. As discussed below, the Court will grant Defendants' motion

for summary judgment on the basis of qualified immunity on Count I, but it will deny summary judgment on Count IV and instead remand those claims to state court.

### A.

In Count I, Youngquist asserts Defendants violated either her Fourteenth Amendment due process rights as a pretrial detainee or her Eighth Amendment rights against cruel and unusual punishment when they shot her with a Taser and searched her. She specifically asserts that using the Taser against her constituted excessive force as she was not threatening Defendants and not acting violently.[5]

---

[5] Youngquist's Complaint does not elaborate on her claim regarding the search itself. In Youngquist's response to the motion for summary judgment, she points out that Peasnall had called off the strip search and that Defendants did not have a warrant to conduct a body cavity search. Additionally, she asserts that the door was not closed to the restroom and explains that she resisted the search simply because she wanted more privacy. Finally, she emphasizes that Harrison touched her during the strip search in violation of the Detention Center's written policies and procedures. But Youngquist's Counsel has completely failed to defend against the qualified immunity defense on these unreasonable search theories. *See Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013) (affirming the district court's decision to grant summary judgment on qualified immunity grounds because the plaintiff "didn't even try to meet" his burden that the law was clearly established); *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (affirming the district court's grant of summary judgment on qualified immunity grounds because the plaintiff "made little, if any, attempt to meet his heavy two-part burden" (internal quotation marks omitted)). Instead of citing any law to demonstrate that officers needed a warrant to conduct a strip search, she cites to evidence as though this were a factual rather than a legal argument. And instead of pointing to any precedent regarding visual versus contact strip searches, she points only to written policies and procedures, which do not, on their own, prove that Defendants violated the Constitution or that the right against contact strip searches was clearly established. *See Romero v. Bd. of Cnty. Comm'rs,* 60 F.3d 702, 705 (10th Cir. 1995) (stating that "violations of state law and police procedure generally do not give rise to a § 1983 claim" for excessive force). To the extent Youngquist asserted a claim that the search was unreasonable because Peasnall called off the strip search, or because the officers did not have a warrant, or because Harrison touched Youngquist during the strip search, the Court grants Defendants' motion for qualified immunity.

The Court must first identify "the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment . . . and each carries with it a very different legal test." *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). Although Youngquist alleges an Eighth Amendment violation, the Eighth Amendment is not applicable here because Youngquist had not been convicted of a crime. Any punishment—not just cruel and unusual punishment—would have violated Youngquist's constitutional rights. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.").

As to the proper analysis for someone detained who has not yet been convicted of a crime, the Tenth Circuit has distinguished between pretrial detainees who have had a judicial determination of probable cause justifying their continued detention before trial (where the Fourteenth Amendment Due Process Clause protects against excessive force) and arrestees who are detained without a warrant and prior to any probable cause hearing (where the Fourth Amendment provides such protections). *Estate of Booker*, 745 F.3d at 419. This distinction between excessive force claims arising under the Fourth and Fourteenth Amendments may not be as significant as it used to be since the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), in which the Supreme Court held that a Fourteenth Amendment due process claim requires "only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 135

S. Ct. at 2473.  Now, in a Fourteenth Amendment excessive force case, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Id.* at 2473.  Because Youngquist had not had a probable cause hearing, her excessive force claim is more properly characterized as a Fourth rather than a Fourteenth Amendment claim.  Under either Amendment, however, the Court would need to consider whether Defendants' use of force was objectively reasonable.

But the Court does not need to resolve whether Harrison used excessive force in deploying the Taser, or whether Stuart can also be held accountable for failing to intervene, because Youngquist has failed to show under the second prong of qualified immunity that the right in question is "clearly established" at the time of the violation.  *Hope v. Pelzer,* 536 U.S. 730, 739 (2002).  "A right is clearly established if it would be clear to a reasonable officer that his conduct was unlawful in the situation."  *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1308 (10th Cir. 2015).  This generally means there "must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Id.*  The Tenth Circuit has adopted "a sliding scale to determine when law is clearly established.  The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'"  *Id.*  Still, "[p]ut simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The Supreme Court has emphasized that courts must not "define clearly established law at a high level

10

of generality" but must instead ask "whether the violative nature of *particular* conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (emphasis added). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).

Specifically, Harrison faced an arrestee who would not comply with verbal instructions to participate in the change out and strip search, and who further pulled away when Harrison attempted to use a small amount of force by removing Youngquist's clothing for her.  Assuming Harrison used excessive force by shooting Youngquist with the Taser, Youngquist has not met her burden to show that the law was clearly established that using a Taser *in this circumstance* constituted excessive force.[6]  She points to a number of cases in which the Tenth Circuit said using a Taser constituted excessive force, but these cases do not address circumstances similar to this case. Specifically, these cases do not involve a lawfully arrested plaintiff who refused to comply with repeated commands and officers' attempts to use lesser amounts of force. For example, Youngquist points to *Casey v. City of Federal Heights*, in which an officer tackled the plaintiff without warning and without informing him that he was under arrest.

---

[6] Youngquist does not cite any cases or make other legal arguments to show that an officer violates clearly established law by using a Taser model she was not trained to use or, more generally, by using a type of force on which she was not trained. Youngquist has thus not met her burden to show the law in such a circumstance was clearly established.

The plaintiff's alleged crime was removing a file from the courthouse, but he was attempting to return the file when the officer tackled him. The plaintiff was not violent nor was he actively resisting arrest. Another officer showed up on the scene and almost immediately deployed a Taser against the plaintiff. 509 F.3d at 1279–80. In that circumstance, unlike here, the plaintiff never had an opportunity to comply with officers' commands. While the Tenth Circuit has stated that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance," *Id.* at 1286, Youngquist cannot deny that she refused to obey verbal commands, and it is not clear what lesser amount of force would have made her comply with orders. Other cases Youngquist cites likewise fail to account for a target who is able to but makes clear that she will not follow orders or comply with minimal force. *See York v. City of Las Cruces*, 523 F.3d 1205 (10th Cir. 2008) (affirming the denial of qualified immunity on an excessive force claim when the officer did not explain to the plaintiff that he was under arrest, but instead grabbed the suspect without warning and then executing an arm-bar takedown when the plaintiff reflexively drew his arm back); *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1204 (D. Colo. 2009) (denying qualified immunity to an officer who asked permission to enter the plaintiff's home, was denied access, and then cut open the screen door and shot the plaintiff with a Taser without warning); *Smith v. City & Cnty. of Denver*, No. CIV.A. 07-CV-00154-W, 2008 WL 724629, at *1 (D. Colo. Mar. 18, 2008) (denying qualified immunity to an officer who used a Taser against an unconscious suspect).

12

Other Tenth Circuit cases acknowledge that some circumstances justify officers' use of escalating force, including the use of a Taser.  For example, in *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993), police initially stopped the plaintiff for the misdemeanor of disturbing the peace.  The plaintiff did not have a weapon and was apparently not under the influence of alcohol or drugs.  He was also outnumbered by the arresting officers.  But the plaintiff refused to talk with the police when they requested him to stop, and he shoved one of the officers when the officer told him to calm down and go home.  The officers then told the plaintiff he was under arrest and tried to grab the plaintiff, wrestled him to the ground, and used a stun gun on him.  The plaintiff was "actively and openly resisting" the officers, "even to the extent of biting the officers."  *Id.* at 781.  Under these circumstances, and primarily because the plaintiff was resisting arrest, the Tenth Circuit held that the officers' use of force, including the use of a stun gun, was not excessive. *Id.* at 782.  *See also Giannetti v. City of Stillwater*, 216 F. App'x 756, 765 (10th Cir. 2007) (concluding officers did not act with excessive force in death of a physically combative, bipolar woman detained on a misdemeanor traffic offense after they forcefully held her to the floor while attempting to change her into a jail uniform, despite her repeatedly stating that she couldn't breathe and that her lungs were collapsing).  Youngquist's conduct here is not as egregious as the plaintiff in *Hinton*, primarily because she had not acted violently toward Defendants, but her conduct is also not as innocent as the plaintiff in *Casey*, who was not aware he was under arrest and did not have any opportunities to comply with the officer's orders.  This case falls somewhere in between, but "a defendant cannot be said to have violated a clearly

established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Id.* (internal quotation marks omitted). Youngquist has not shown that this is the case here.

The weight of authority from other circuits also could not have made clear to Defendants that using the Taser here would constitute excessive force. *Compare Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) ("At the time [the officer] deployed his Taser and arrested [the plaintiff], the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator."), *with Brown v. Cwynar*, 484 F. App'x 676, 681 (3d Cir. 2012) ("At the time of the events in question, multiple courts of appeals had approved of the use of taser guns to subdue individuals who resist arrest or refuse to comply with police orders."); *and Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that the use of a Taser to effectuate an arrest was reasonable when the individual was "hostile, belligerent, and uncooperative," and noting that a verbal arrest command accompanied by attempted physical handcuffing "may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either [the officer or plaintiff] would be seriously hurt").

Youngquist has failed to carry her burden to show that the law clearly established that using a Taser against a target who refused to obey verbal commands and resisted less forceful attempts to induce compliance constituted excessive force.  The Court will thus grant Harrison's motion for summary judgment on the basis of qualified immunity.

The fact that the law was not clearly established as to Harrison guts Youngquist's claim that Stuart failed to intervene.  Because it was not clear that Harrison's conduct in using the Taser would constitute excessive force, Stuart likewise would not have known that she needed to prevent Harrison from acting.  The Court will thus grant Defendants' motion for summary judgment on the basis of qualified immunity as to both Harrison and Stuart for Count I.

## B.

Youngquist's only remaining claim is her state-law tort claims in Count IV. Because the court has "dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3), and because this case was originally filed in state court and removed to federal court, the Court will decline to exercise supplemental jurisdiction to consider the claims in Count IV, including whether Defendants are entitled to any sort of immunity.  *See Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)).  The Court will remand the remaining claims to state court.

**IV.**

For the reasons stated above, Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity and on Other Grounds is granted in part and denied in part. The Court grants the motion as it pertains to Count I for a violation of constitutional rights under 42 U.S.C. § 1983, but it denies the motion without prejudice as it pertains to Count IV for state-law tort claims.   The Court declines to exercise supplemental jurisdiction to consider the claims contained in Count IV and will instead remand to state court.

SO ORDERED.

Entered for the Court
this 13th day of December, 2016.


Bobby R. Baldock
United States Circuit Judge
Sitting By Designation